UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN CHAPMAN, )
                                                )   Case No.: 1:18-cv-00027
        Plaintiff, )
                                                )
   v. )
                                                )   Judge Michael R. Barrett
NORFOLK SOUTHERN )
RAILWAY COMPANY, )
                                                )
        Defendant. )

## ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 10) and Defendant's Cross-Motion for Partial Summary Judgment (Doc. 15). These Motions have been fully briefed (*see* Docs. 18–21, 23),[1] such that the issues presented are ripe for consideration. As explained below, Plaintiff's Motion will be GRANTED, and Defendant's Motion will be DENIED.

### I. BACKGROUND

### A. Facts

The facts needed to decide the pending cross-motions are essentially undisputed.

### 1. Plaintiff's injury

Defendant Norfolk Southern Railway Company ("NSRC") employed Plaintiff John Chapman as a conductor. (Doc. 10-2, Chapman Dep. at PageID 64 (19:20–22)). On

---

[1] Over Defendant's objection, this Court previously granted Plaintiff's Motion to Supplement his Memorandum in Support of his Motion for Partial Summary Judgment. (Doc. 32).

December 29, 2016, the day of his injury, Chapman reported to work at NSRC's Portsmouth yard. (*Id.* at PageID 66 (26:11–14), 67 (30:12–20)). His engineer was Billy Webb. (*Id.* at PageID 68 (34:7–22)). Yardmaster Ryan Lute held a routine job briefing with Chapman and Webb, who were then driven from the yard office to the "head end" of the "eastbound main" by Trainmaster Patrick Malecki. (*Id.* (35:8–23; 36:6–24)). Webb referred to this track as "Main 1" at West Avenue. (Doc. 10-6, Webb Dep. at PageID 102 (17:3–5)). As the two-man inbound crew descended the train, they told Chapman and Webb, "Everything's good, you're ready to go." (Doc. 10-2, Chapman Dep. at PageID 69 (37:4–21; 38:3–9)). Chapman and Webb then ascended the train. (*Id.* (38:10–39:13)). When they entered the lead locomotive cab, the overhead reading lights were on, as well as the interior and exterior step lights that stay on when the motor is running. (*Id.* at PageID 70 (41:15–18; 42:7–19; 43:4–44:18), 71(46:4–13)). Chapman reflexively flipped the switch for the toilet compartment located beneath the cab and began descending the steep interior steps leading to it. (*Id.* at PageID 72 (49:9–52:8)). Then he fell:

> Q. Okay. Now, in the step area as you're coming down, are there any other lights other than what we're kind of calling the step lights?
>
> A. In the step area coming down, no, there's just the step light.
>
> Q. So going back to what you told me earlier, it sounds like you took your first step to try to get off of the top step to the second step and that's when the accident started?
>
> A. I started down, I took my first step, and as I was planting my foot, I realized it was dark and I couldn't see the step. It was too late and the back of my heel caught the lip of that step and then down I went.

2

> Q. Yes, sir. Do you remember which foot you stepped down to that first step with?
>
> A. My left foot.
>
> Q. Okay. And your heel caught the lip and made you fall?
>
> A. Well, the light being off made me fall.

(*Id.* at PageID 73 54:1–25); *see id.* at PageID 79–80 (79:1–24; 80:17–82–6)). Paramedics took Chapman to the hospital. (*Id.* at PageID 79 (77:3–78–7), 80 (82:7–22). Chapman suffered a herniated disc at C5-C6, which he testified has prevented him from working. (*Id.* at PageID 87 (109:2–17; 112:2–3)). NSRC's medical expert confirms Chapman's work-place injury:

> As a result of work activities occurring on 12/29/16, the claimant sustained cervical sprain/strain, closed head injury, concussion, and transient loss of consciousness based upon the records available. I do believe the claimant has an injury of structural significance in the cervical spine including disc displacement at C5-C6 to result in neurological irritation/mild compression involving the C6 nerve root also as a result of the 12/29/16 event. I do believe the claimant merits surgical intervention in terms of the cervical spine condition as identified and related to the event of 12/29/16.

(*See* Doc. 10-10, Thomas A. Bender, M.D., Orthopaedic Surgeon 8/28/2018 eval. at PageID 131).

It is undisputed that the step light was burned-out. Webb testified to this fact along with Chapman. (*See* Doc. 10-6, Webb Dep. at PageID 102 (18:21–24)). According to the NSRC injury report, "[t]he Mechanical department replaced the step light and took no exception to the locomotive interior steps." (Doc. 10-9 at PageID 127; Doc. 18-1, Maleki Aff. at PageID 179 (¶ 7)).

3

### 2. Pre-departure tasks remaining

At the time of Chapman's injury, although the motor was running, the train was stationary. Engineer Webb testified that the train had a "current calendar day inspection" card, meaning that he was to conduct no further inspection himself. (*See* Doc. 10-6, Webb Dep. at PageID 101 (13:10–14:11; 16:3–22)). Nonetheless, prior to departure, Chapman as conductor ordinarily would check "the head six cars . . . for defects." (Doc. 10-2, Chapman Dep. at PageID 66 (28:9–16)). Part of this check includes releasing the hand brakes of any trains that are "tied down." (*Id.*; *see* Doc. 18 at PageID 156; Doc. 18-1, Makeki Aff. at PageID 179–180 (¶ 8 ("If any handbrakes had been applied by the inbound crew of that train following their arrival, it would have been necessary for Mr. Chapman, or some other member of the crew, to release each of those handbrakes before their train could depart."))). Additionally, Chapman acknowledged it was necessary to "finish fueling and get a signal." (Doc. 10-2, Chapman Dep. at PageID 89 (120:11–18)). The fueling process takes approximately 30 minutes and was "ongoing" at the time of Chapman's fall. (Doc. 18-1, Maleki Aff. at PageID 180 (¶ 9)). Engineer Webb also would have been responsible for performing a four-step "set and release" test to be sure that the automatic brake system was functioning properly. (*Id.* (¶ 10); Doc. 10-2, Chapman Dep. at PageID 90 (121:1–15)). Once completed, the "outbound crew"—Chapman and Webb—could advise the Yardmaster that the train was ready to depart. (Doc. 18-1, Maleki Aff. at PageID 180 (¶ 11)). The signal to proceed would come from the Train Dispatcher at his discretion. (*Id.* (¶¶ 11–12)).

### B. Procedural posture

Chapman initiated this civil action alleging violations of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701, *et seq.*, and various provisions of the Code of Federal Regulations. He seeks judgment as a matter of law, contending that NSRC is strictly liable under the FELA because it failed (1) to keep all parts and appurtenances (here, the step light) in a proper condition and safe to operate in violation of the LIA; and (2) to comply with safety regulations promulgated and published at 49 C.F.R. §§ 229.7, 229.45.[2] In opposition, NSRC argues—and seeks judgment as a matter of law—that, because the locomotive was not "in use" at the time of the incident, the LIA does not apply. NSRC further argues that a burned-out light bulb is not an "appurtenance" as contemplated by the LIA. Finally, NSRC contends that there remains a question of material fact as to what caused Chapman's injury.

## II.   LEGAL STANDARDS

### A. Summary judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party

---

[2] Chapman does not seek summary judgment based on alleged violations of 49 C.F.R. §§ 229.119(c) or 229.127(b) (Count I) or his negligence claim under the FELA (Count III). (*See* Doc. 10 at PageID 37 (¶ 7); Doc. 20 at PageID 199–200 & n.3).

5

bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587.  However, the nonmoving party may not rest on the mere allegations in the pleadings.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  The substantive law of the case determines what facts are material and whether a higher burden of proof is required for a particular element.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Jarrett v. CSX Transp., Inc.*, No. 1:08-CV-290, 2008 WL 4239148, at *8 (N.D. Ohio Sept. 10, 2008) (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted)).  These standards upon which the court evaluates motions for summary judgment do not change simply because the parties present cross-motions.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

   B. **The statutes generally**

The "prime purpose" of the FELA is the "protection of railroad employees."  *Urie v. Thompson*, 337 U.S. 163, 191 (1949).  The FELA creates a statutory cause of action allowing an employee to recover for employer negligence that "in whole or in part" causes an employee's injury.  45 U.S.C. § 51.  A relaxed standard of causation applies under the FELA.  *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506 (1957).  "[A]n employee must prove **only** that the railroad's negligence played **a** part in producing the

injury for which the employee seeks damages[.]" *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013) (emphasis in original).[3]

To "supplement" the FELA and to "facilitat[e] employee recover[y]," Congress enacted the Locomotive Inspection Act (formerly known as the Boiler Inspection Act). *Urie*, 337 U.S. at 189, 191. The LIA provides:

> **A railroad carrier may use** or allow to be used **a locomotive** or tender on its railroad line **only when the locomotive** or tender **and its** parts and **appurtenances**—
>
> (1) **are in proper condition and safe to operate without unnecessary danger of personal injury**;
>
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
>
> (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701 (emphasis added). Notably, by its own terms, the LIA applies only to locomotives that are "in use on the line." *See Brady v. Terminal R.R. Ass'n*, 303 U.S. 10, 13 (1938); *Justice v. Norfolk S. Ry. Co.*, No. 1:17-cv-771, 2019 WL 1543964 (S.D. Ohio Apr. 9, 2019).

"Negligence is not the basis for liability under the [LIA]." *Lilly v. Grand Trunk W.R.R. Co.*, 317 U.S. 481, 485 (1943). Instead, it imposes "an absolute and continuing duty" to maintain the locomotive and its parts and appurtenances such that they are in proper condition and safe to operate. *Id.* (quoting *Southern Ry. Co. v. Lunsford*, 297 U.S. 398, 401 (1936)). Absolute liability is imposed upon the employer when its

---

[3] The FELA it is not a workers' compensation statute, however. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). The Supreme Court has insisted that the "FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.'" *Id.* (quoting *Ellis v. Union Pac. R.R. Co.,* 329 U.S. 649, 653 (1947)).

7

employee "presents proof of an unsafe locomotive component and injury which is proximately caused by the unsafe condition." *Williams v. S. Pac. Transp. Co.*, 813 F. Supp. 1227, 1230 (S.D. Miss. 1992) (citing *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 810 (6th Cir. 1985) ("The liability imposed by the Locomotive Boiler Inspection Act is absolute upon proof of an unsafe part and proximate cause.")).

The LIA does not create an independent cause of action. Instead, "[a] violation of the LIA is negligence *per se* **under the FELA**." *Szekeres*, 617 F.3d at 427 (emphasis added) (citing *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 188 (6th Cir. 1993)). The relationship between FELA and the LIA is as follows:

> The [LIA] and the FELA are interrelated. The [LIA] is one of the Safety Appliance Acts ("SAA"). Strict liability under the FELA results when a rail carrier violates the SAA. Thus, railroads whose employees are injured as a result of violations of the [LIA] will incur strict liability under the FELA. There are two ways a rail carrier can violate the [LIA]. A rail carrier may breach the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life or limb, or a rail carrier may fail to comply with the regulations issued by the [Federal Railroad Administration].

*McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 298–99 (7th Cir. 1996) (internal citations omitted).

Relevant to these cross-motions are the following two safety regulations issued by the Secretary of Transportation[4], 49 C.F.R. §§ 229.7 and 229.45:

§ 229.7 Prohibited acts and penalties.

(a) Federal Rail Safety Laws (49 U.S.C. 20701–20703) make it unlawful for any carrier to use or permit to be used on its line any locomotive unless the entire locomotive and its appurtenances –

---

[4] "The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a).

8

> (1) Are in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb[.] . . .

§ 229.45 <u>General condition</u>.

All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train. . . .

### III. ANALYSIS

**A. The locomotive was "in use" for purposes of the LIA.**

Whether a locomotive is "in use" for purposes of the LIA is a question of law for the trial court to decide. *Pinkham v. Maine Cent. R.R. Co.*, 874 F.2d 875, 881 (1st Cir. 1989). The Sixth Circuit has not squarely determined when a locomotive or train is "in use on the line" for purposes of the LIA. *Coleman v. Norfolk S. Ry. Co.*, 304 F. Supp. 3d 648, 653 n.1 (N.D. Ohio 2018)

NSRC contends that the stationary train was not "in use" because several pre-departure tasks remained at the time of Chapman's injury. Chapman counters that the proper inquiry is the location of the equipment and the job assignment of the injured party. *See Deans v. CSX Transp. Inc.,* 152 F.3d 326 (4th Cir. 1998) ("[T]he primary factors we consider are where the train was located at the time of the accident and the activity of the injured party."). The Court agrees with Chapman, and other courts in this district, that the test first articulated in *Deans* should guide the analysis. *See Justice*, 2019 WL 1543964, at *4 (citing *Aldridge v. CSX Transp., Inc.,* Case No. 1:06-CV-00128 (S.D. Ohio April 17, 2007); *Hinkle v. Norfolk S. Ry. Co.,* No. 2:05-cv-574, 2006 WL 3783521 (S.D. Ohio Dec. 21, 2006)).

In *Deans*, a conductor was injured in the course of releasing a hand brake on a rail car. 152 F.3d at 328. However, he did not immediately seek medical treatment. *Id.*

9

That rail car was replaced, the necessary air brake test was performed, and the train proceeded. *Id.* The conductor sought medical assistance upon arrival and the railroad subsequently determined that the hand brake causing the injury was defective. *Id.* The Fourth Circuit rejected a "bright-line" distinction "between trains which have had their pre-departure inspections and tests completed and been okayed for service (and are therefore 'in use'), and those for which pre-departure tests have not yet been completed (and therefore not 'in use')[.]" *Id.* at 329. Citing *Brady*, *supra*, 303 U.S. at 13, the court noted that "[a] train may still be considered 'in use' even though it is motionless and not yet on the main track." 152 F.3d at 330. "In this case, although the train had not yet begun moving on the main track, it had already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure—not in storage or waiting to be moved into a repair location." *Id.* Persuasive also was the fact that "Deans, as a conductor, was part of the transportation crew and in no way involved in the repair or the maintenance of the train." *Id.*

Here, the locomotive was on the mainline track, with its engine running. The calendar day inspection report was valid. The train was a "relay" train, stopping only to swap personnel and add fuel. (*See, e.g.,* Doc. 10-6, Webb Dep. at PageID 100 (9:2–14)). Like the plaintiff in *Deans*, the injured party was a conductor and thus a member of the transportation crew, meaning not involved in the servicing or repair of the locomotive. Although some pre-departure tasks—including the release of hand brakes—were not completed, we agree with our colleague Judge Dlott that they were merely "a series of readying tasks" that do not preclude a finding that the locomotive

was "in use on the line." *See Justice*, 2019 WL 1543964, at *5. This includes a discretionary decision by the Train Dispatcher as to when the train could safely depart.

Even though they do not engage in a *Deans*-like analysis, several of the cases NSRC cites in support are nonetheless distinguishable. In *Trinidad v. S. Pacific Transp. Co.*, 949 F.2d 187, 188 (5th Cir. 1991), the injured party was a carman, not a conductor or engineer who would be involved in the actual transportation of the locomotive from one destination to another. The carman's inspection, done in the yard, precedes any notification to the engineer. *Id.* at 188–89.[5] Similarly, the train in *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 286 (4th Cir. 1999), was involved in normal switching operations and the party injured was a brakeman. This case is not, as NSRC's claims, "the mirror image of what Mr. Chapman had not yet even started (releasing hand brakes) when he fell." (Doc. 18 at PageID 160). Rather, the brakeman was part of a yard crew that took arriving trains apart and put departing trains together, and prepared assembled trains for predeparture inspection by the car department that eventually turns the train over to the transportation crew. *Phillips*, 190 F.3d at 286–87. The brakeman was injured while setting the handbrakes on a "completed" train prior to turning it over to the car department for its predeparture inspection. *Id.* at 287. Finally, the locomotive in *Garcia v. Union Pacific R.R. Co.,* 835 F. Supp. 1360, 1362 (D. Kan. 1993), was "disconnected from its train and driven on side tracks to the refueling pit."

NSRC also cites *Coleman* in support, which Chapman calls "wrongly decided[.]" (*See* Doc. 20 at PageID 194). Different from the facts of this case is that the train there was "tied down on siding[]" and had sat "motionless[] for at least 8 hours prior to

---

[5] Notably, in *Deans* the Fourth Circuit expressly rejected the reasoning in *Trinidad*. 152 F.3d at 329.

Plaintiff's arrival. *Coleman*, 304 F. Supp. 3d at 654. Closer to the facts of this case is that the employee was a transportation employee, the hand brakes on the locomotives and the air brakes on the rail cars had not yet been released, and the train had not been cleared for departure. *Id.* Upon consideration, the undersigned agrees with Chapman that *Coleman* did not reach the correct result. Even Judge Wilhoit had his doubts, as he certified the question for an interlocutory appeal to the Sixth Circuit under 28 U.S.C. § 1292(b).[6]

In sum, the Court finds that the train was "in use on the line" for purposes of the LIA.[7] The Court will next determine whether a burned-out light bulb is an appurtenance as contemplated by the LIA.

**B. The light was an "appurtenance" for purposes of the LIA.**

NSRC argues that a light bulb illuminating an interior stairwell is not an "appurtenance" as contemplated by the LIA. It suggests a finding otherwise would yield an harsh result: "[A]bsolute and automatic liability is sought to be predicated here solely upon an event which, sooner or later, happens to every light: the bulb burns out." (Doc. 18 at PageID 163).

An appurtenance is "[w]hatever in fact is an integral or essential part of a completed locomotive." *Lunsford*, 297 U.S. at 402. Few cases discuss the issue. In *McGinn*, *supra*, a brakeman tripped over a suitcase on his way to the toilet compartment. 102 F.3d at 297. He claimed that the railroad violated the LIA because it

---

[6] Plaintiff appealed, but the Sixth Circuit declined to take review. *Coleman v. Norfolk S. Ry. Co.*, No. 14-cv-00107 (Doc. 71) (E.D. Ky. Apr. 11, 2018).
[7] In their respective briefs, parties disagree about whether the opinion testimony of Michael J. O'Brien, retained by Chapman, should be considered by this Court. This issue is moot, because this Court's decision on this question of law was made without reference to Mr. O'Brien's opinion.

12

failed to install luggage racks. *Id.* at 298. The Seventh Circuit affirmed summary judgment in the railroad's favor, finding that no applicable federal regulation required installation and, also, that "a luggage rack does not constitute an integral or essential part of a locomotive." *Id.* at 299. In *Mosco v. Baltimore & Ohio R.R.,* 817 F.2d 1088, 1089 (4th Cir. 1987), an engineer was injured when a rock came through an open window and struck him in the head. The appellate court found it was not error for the trial court to have excluded as irrelevant evidence concerning the absence of screens, bars, grates or similar protective devices from the locomotive cab windows. *Id.* at 1090–92. Such protective devices, in the court's assessment, did not constitute "an integral or essential part of a completed locomotive." *Id.* at 1091.

This Court finds no reason why a light illuminating a stairwell leading to the toilet compartment underneath the cab is not an integral or essential part of a completed locomotive. The statute makes no distinction that the appurtenance in question must be the *most* essential part of the locomotive, just *an* essential part. And because the light bulb had burned out, the step light was not in "proper condition" and the train was not "safe to operate without unnecessary danger of personal injury" as required by the LIA.

It is true that light bulbs burn out randomly. But predictability is not the standard. Rather, a rail carrier's duty under the statute is absolute and continuous. *See generally O'Donnell v. Elgin, Joliet & E. Ry. Co.*, 338 U.S. 384, 390–91 (1949) ("The statutory liability is not based upon the carrier's negligence. The duty imposed is an absolute one, and the carrier is not excised by any showing of care, however assiduous.") (quoting *Brady*, *supra*, 303 U.S. at 15)). And here, liability attaches against NSRC under the LIA.

13

## C. NSRC's violation of the LIA clearly played a part in, and therefore caused, Chapman's injury.

NSRC is correct that, even when arguing a violation of the LIA, a plaintiff still must establish that the violation caused his injury. *Szekeres, supra*, 731 F.3d at 599. But, as discussed earlier, that standard is broad and relaxed. Chapman must show only that NSRC's actions—or here, inaction—played "any part, even the slightest" in his injury. (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (quoting *Rogers, supra,* 352 U.S. at 506). Chapman testified consistently that he fell because he couldn't see the step, and he couldn't see the step because the step light was burned out.

NSRC argues that Chapman's testimony concerning his "one fluid motion" out of his chair in the cab and down the steps to the toilet compartment creates a question of material fact as to whether Chapman's "own conduct was the sole legal cause of his injury." (See Doc. 18 at PageID 166 (citing Doc. 10-2, Chapman Dep. at PageID 72 (50:1–8)).

"While the FELA does not permit the affirmative defense of contributory negligence to bar an employee's claim, courts have developed an affirmative defense of 'sole proximate cause.'" *Jarrett*, *supra*, 2008 WL 4239148, at *5 (citing *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 351 (6th Cir. 2002)). The Sixth Circuit affirmed a jury instruction to this effect because, in *Toth*, the railroad "proffered the inconsistent testimony of the employee regarding the events of the injury, the impossibility of the employee's injury if he had been properly following safety standards, and circumstantial evidence that the instrumentality of the injury [a coupling lever] could not have been defective in the way described by the employee." *Id.* (citing *Toth*, 306 F.3d at 352). The

14

facts here, though, are quite distinct from *Toth*. As NSRC emphasizes, Chapman did not waiver from his testimony that the cause of his fall was the burned-out step light. And, in its injury report, NSRC acknowledges that the step light was indeed burned-out and consequently replaced. Rather, the facts here are akin to those in *Jarrett*, where, on summary judgment, the district court found that the employer railroad had not "brought forth enough evidence to establish a jury question as to whether the Plaintiff [ ] was the sole proximate cause of this injury." *Id.* at *6. The railroad's own inspection report in that case acknowledged the presence of an air hose laying on the floor in the toilet compartment, where the employee stated he slipped and fell. *Id.*

Based on an examination of the record as argued in the cross-motions for summary judgment, this Court determines that there is insufficient evidence from which a reasonable jury could conclude that Chapman's "one fluid motion" was the "sole cause" of his injury. Consequently, under applicable case law, Chapman has proven causation vis-à-vis NSRC's violation of the LIA.

## IV.　CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Doc.10), is hereby **GRANTED**, and Defendant's Cross Motion for Partial Summary Judgment (Doc. 15) is hereby **DENIED**. The final pretrial conference date of June 29, 2020 at 11:00 a.m. remains in place, as does the trial setting of August 3, 2020.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　/s/ *Michael R. Barrett*
　　　　　　　　　　　　　　　　　　　Michael R. Barrett, Judge
　　　　　　　　　　　　　　　　　　　United States District Court